# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1536V
(not to be published)

* * * * * * * * * * * * * * * * * * * * * * * * *

DE'ANN ZASTROW,

        Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

        Respondent.

* * * * * * * * * * * * * * * * * * * * * * * * *

Filed: March 20, 2023

Damages Decision; Pain and Suffering; Influenza ("Flu") Vaccine; Shoulder Injury Related to Vaccine Administration ("SIRVA").

*David Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner
*Camille Collett*, U.S. Department of Justice, Washington, DC, for Respondent

## DECISION AWARDING DAMAGES[1]

On October 3, 2019, De'Ann Zastrow ("Petitioner") filed a petition seeking compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq*. ("the Vaccine Program").[2] Pet., ECF No. 1. Petitioner alleges she suffered from a shoulder injury related to vaccine administration ("SIRVA") as a result of the influenza ("flu") vaccination she received on November 28, 2017. Pet. at 1.

---

[1] Although this Decision has been formally designated "not to be published," it will nevertheless be posted on the Court of Federal Claims' website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet**. As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the Decision in its present form will be available. *Id*.

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

1

For the reasons discussed in this Decision, I find that Petitioner is entitled to a pain and suffering award of $70,000.

## I. Relevant Procedural History

I issued a Ruling on Entitlement on April 18, 2022, finding that Petitioner was entitled to compensation. Ruling on Entitlement, ECF No. 49. I then issued a damages order that same day. ECF No. 50.

On July 25, 2022, the parties filed a joint status report indicating that damages could not be resolved informally given the demands exchanged. The parties did not request a damages hearing, and instead asked that I set a briefing schedule. ECF No. 57.

On August 2, 2022, Petitioner filed a Motion for a Ruling on the Record for Petitioner's Damages. ECF No. 58 (hereinafter "Petitioner's Brief" or "Pet'r's Br."). On November 4, 2022, Respondent file a response. ECF No. 59 (hereinafter "Respondent's Brief" or "Resp't's Br."). On November 22, 2022, Petitioner filed a reply. ECF No. 60 (hereinafter "Petitioner's Reply Brief" or "Pet'r's Reply Br."). The parties filed a joint status report on December 15, 2022, indicating that the record was complete. ECF No. 61. This matter is now ripe for a decision on damages.

## II. Medical History

### A. Medical Records

At the time of vaccination, Petitioner was 48 years old and had a history of anxiety and arthritis. Ex. 1 at 75. Petitioner received her flu vaccine in her left shoulder on November 28, 2017. *Id.* at 79.

On January 24, 2018, 57 days later, Petitioner saw NP Kontia Grant, reporting left arm pain secondary to the flu shot she received on November 28, 2017. Ex. 1 at 83. Petitioner stated that her pain was "achy" and that it started "in [her] upper arm and [went] down to [her] elbow." *Id.* She reported that the pain sometimes woke her up at night and was worse first thing in the morning. *Id.* Petitioner had trouble lifting her left arm, but an examination revealed normal range of motion and strength and no tenderness or swelling. *Id.* at 85. NP Grant recommended Flexeril, and Petitioner responded that she wished to continue with Naproxen and Aspercreme. *Id.* at 85.

On April 12, 2018, Petitioner visited Kelly Purcell, D.O. Ex. 1 at 95. During this visit, Petitioner complained of left arm pain that began after her flu shot in November of 2018.[3] *Id.* She described the pain as sharp and stabbing and stated that it was present all the time. *Id.* She stated that Flexeril had not helped and that the pain radiated from her upper arm down to her hand. *Id.* The musculoskeletal portion of the exam notes "Normal range of motion, Normal strength, left arm tender diffusely with palpation." *Id.* at 97. Dr. Purcell ordered a nerve conduction study ("NCS") and gave Petitioner an injection of Toradol. *Id.*

---

[3] The medical record for this April 2018 visit states that Petitioner had received her flu shot in November 2018. I presume this to be a typographical error.

2

On May 1, 2018, Petitioner underwent an electromyography NCS of her left arm. Ex. 3 at 6. The results showed "incidental chronic left C8-T1 radiculopathy." *Id.*

On May 22, 2018, Petitioner saw Dr. Purcell regarding the NCS results. Ex. 1 at 100. Petitioner complained of ongoing left arm pain that was "sharp" and "stabbing," and radiated from her upper arm or neck down to her hand. *Id.* Examination revealed normal range of motion and strength, as well as tenderness with palpation in the left arm. *Id.* at 102. Dr. Purcell diagnosed Petitioner with cervical radiculopathy. *Id.* She prescribed Neurontin and recommended a cervical MRI. *Id.* Petitioner underwent the cervical MRI on June 1, 2018. *Id.* at 103. The MRI showed "[m]inimal degenerative changes throughout the cervical spine without evidence of spinal canal narrowing or neural foraminal stenosis at any level." *Id.* at 104. Moreover, there was a "normal appearance of the cervical spinal cord." *Id.*

Petitioner attended an initial physical therapy evaluation on June 12, 2018. Ex. 4 at 2. Petitioner complained of left arm pain after a flu shot in November 2017, as well as neck pain. *Id.* On exam, petitioner's range of active motion was measured at 180°. *Id.* However, this same record notes that "Patient presents with losses in - ROM [range of motion] – Strength". *Id.* at 4. The record notes that "[p]ain is constant, pain worsens with lifting, pulling, dressing, work demands as a seamstress." *Id.* The same record indicates that her losses resulted in functional limitations, which include "pain with reaching across body and putting on clothing," "pain with lifting objects", and "increased pain with pulling activities." *Id.*

On June 26, 2018, Petitioner returned to Dr. Purcell for a follow up on multiple issues, including left arm pain that was unchanged since her previous appointment. Ex. 1 at 106. Petitioner reported that steroids, NSAIDs, and Flexeril had not helped. *Id.*

Petitioner attended 15 physical therapy ("PT") sessions and was discharged in August 2018. Ex. 4. at 35. The PT discharge report reflects that Petitioner's progress had "reached a plateau" and that her left arm pain was ongoing. *Id.* The physical therapist noted that Petitioner's prognosis was "excellent" provided that she continued with the home program as prescribed. *Id.* at 34.

No further medical records relevant to my assessment on damages have been filed.

### B. Petitioner's Affidavit

On October 14, 2019, Petitioner filed an affidavit. ECF No. 6-6 (filed as Ex. 2) (hereinafter "Aff."). In it, Petitioner stated that she began to have sharp pain in her left shoulder immediately after receiving the flu vaccine. Aff. at 2. She stated that, over the following weeks, the pain worsened and she began to experience decreased range of motion to the point that she consulted her primary care physician in January 2018. *Id.* at 3.

Petitioner averred that her shoulder pain has interfered with her work as a furniture upholsterer because it is difficult to lift heavy objects and to raise her left arm over her head. Aff. at 3. She stated that she is "physically and mentally exhausted from this experience" and "afraid that [she] will not regain full function and a pain free life." *Id.* at 4.

3

### C. Petitioner's Supplemental Affidavit

On March 16, 2022, Petitioner filed a supplemental affidavit. ECF No. 47-1 (filed as Ex. 11) (hereinafter "Supp. Aff."). In it, Petitioner stated that the 15 PT sessions improved her symptoms somewhat, but that they never completely resolved. Supp. Aff. at 1. Petitioner stated that she "continue[s] to have pain, discomfort and decreased range of motion in my left shoulder, all of which affect my daily life, hobbies, and activities of daily living." *Id.* at 2. Petitioner rated her pain as ranging between a 2 and 5 out of 10 on the pain scale. *Id.*

Petitioner stated that her pain has been "severe and unrelenting" since November 2017 and that she has "suffered physically and emotionally as a result." Supp. Aff. at 2. She described difficulty performing daily tasks and playing with her grandchildren and stated that she controls the pain with ice and over the counter medications. *Id.* Petitioner also stated that she has not returned to PT or to an orthopedist because it would be "futile" as she did not want to undergo surgery or cortisone injections. *Id.* at 3.

## III. Legal Standard

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), originally issued Apr. 19, 2013 ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("The assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *See I.D.*, 2013 WL 2448125, at *9; *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995).

Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury… not to exceed $250,000." § 15(a)(4). In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering. *See I.D.*, 2013 WL 2448125, at *9-11, *citing McAllister*, 1993 WL 777030, at *3. In evaluating these factors, I have reviewed the entire record, including medical records, documentary evidence, and the affidavit submitted by Petitioner.

## IV. Prior SIRVA Compensation within SPU[4]

### A. Data Regarding Compensation in SPU SIRVA Cases

---

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

4

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2023, 3,031 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,950 of these cases, with the remaining 81 cases dismissed.

Of the compensated cases, 1,677 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 148 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly situated claimants should also receive.[5]

1,501 of this subset of post-entitlement determination, compensation-awarding cases were the product of informal settlement -- cases via proffer, and there were 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 1,273 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[6] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *148* | *1,501* | *28* | *1,273* |
| **Lowest** | $40,757.91 | $22,500.00 | $45,000.00 | $5,000.00 |

---

[5] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[6] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

| | | | | |
|---|---|---|---|---|
| **1st Quartile** | $70,382.97 | $65,000.00 | $90,000.00 | $40,000.00 |
| **Median** | **$93,649.92** | **$85,000.00** | **$122,886.42** | **$56,250.00** |
| **3rd Quartile** | $125,000.00 | $112,654.00 | $161,001.79 | $82,500.00 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 148 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $90,000.00 as the median amount. Only seven of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[7]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In six cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### V.   Appropriate Compensation in this SIRVA Case

Petitioner requests a pain and suffering award of $80,000, while Respondent argues for a pain and suffering award of $50,000. Both parties have provided a number of cases they believe are comparable to Petitioner's. When performing this analysis, I reviewed the record as a whole, including the medical records and affidavits. I also take into account prior awards for pain and suffering in both SPU and non-SPU SIRVA cases. I base my decision as to the appropriate amount

---

[7] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

of damages on the particular facts and circumstances of this specific case.

The parties do not dispute Petitioner's awareness of her injury. The record reflects that at all relevant times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, my analysis will focus mainly on the severity and duration of Petitioner's injury.

The medical records and my prior factual ruling in this case establish that Petitioner suffers from a SIRVA injury with moderate levels of pain and limited range of motion that have persisted since her vaccination in November 2017. Petitioner's affidavit states that her pain began immediately after vaccination, although her medical records show that she did not seek medical advice until nearly two months later. *Compare* Aff. at 2, Ex. 1 at 83. At the first appointment documenting her SIRVA injury, Petitioner told her medical provider, "The pain starts in my upper arm and goes down to my elbow. It's achy. It's hard to lift my arm. It wakes me up and hurts when I wake up in the morning[]." Ex. 1 at 83.

On June 27, 2022, I issued a fact ruling finding that Petitioner suffered decreased range of motion in her shoulder due to the flu vaccine. ECF No. 55 at 2. I gave Petitioner's affidavit "significant weight," noting in particular her description of how her injury has impacted her ability to function in daily life. *Id.* at 6. Petitioner works as a furniture upholsterer and has difficulty lifting heavy objects and raising her left arm above her head. Supp. Aff. at 2.

Petitioner also described the psychological toll that her SIRVA injury has taken on her. Her PT record reflects that, after 15 sessions, Petitioner was still experiencing some left arm pain and reduced strength, and that her improvement had reached a plateau. Ex. 4 at 35. Petitioner described feeling "physically and mentally exhausted" by her injury and that she feared that her pain would never fully resolve. Aff. at 4. ("I don't believe there is much more I can do for my shoulder except to manage the pain and deal with it on a daily basis.").

Petitioner's medical records and affidavits establish that the duration of her treatment was slightly less than seven months. Ex. 1 at 83 (Petitioner's first visit to NP Grant on January 24, 2018); Ex. 4 at 35 (Petitioner's discharge from PT on August 13, 2018). Although the duration of Petitioner's treatment was shorter than in some other SIRVA cases, I find that Petitioner's decision not to seek further treatment was reasonable in light of her physical therapist's assessment that she had reached a plateau and that she should continue home exercises. Ex. 4 at 35. Petitioner continues to do exercises at home and manages her pain with over-the-counter medication and ice. Aff. at 4.

Of the cases cited to by the parties, I have identified three that I find most comparable to the case at hand. In *Vinocur*, Special Master Dorsey awarded $70,000 in pain and suffering damages to a petitioner who showed that his pain and range of motion had steadily worsened until he began treatment. *Vinocur v. Sec'y of Health & Hum. Servs.*, No. 17-598V, 2020 WL 1161173 *12, 16 (Fed. Cl. Jan. 31, 2020). The petitioner in *Vinocur*, like Petitioner here, attended 15 PT sessions and received one injection for pain. *Id.* at *6, 13. The petitioner in *Vinocur* also described ongoing trouble sleeping due to continuing pain in his shoulder. *Id.* at *14. The special master awarded the petitioner in *Vinocur* $70,000 in pain and suffering damages despite his delay of four and a half months in seeking treatment initially, a time period roughly twice as long as Petitioner's

7

57 days. *Id.* at *15-16.

Respondent cites *Rayborn v. Sec'y of Health & Hum. Servs.*, in which the petitioner received an award of $55,000 in pain and suffering damages. No. 18-0226V, 2020 WL 5522948, at *1 (Fed. Cl. Spec. Mstr. Aug. 14, 2020). The petitioner had begun experiencing shoulder pain immediately after vaccine administration and sought treatment when she began to experience issues with range of motion approximately four months later. *Id.* at *3-4. The petitioner in *Rayborn* received one cortisone injection and underwent 14 occupational therapy ("OT") sessions, and experienced mild to moderate symptoms for a period of nine months. *Id.* at 12. Here, Petitioner received one shot of Toradol and underwent 15 PT sessions, but her symptoms have been moderate and continue to this day. *See* Aff. at 2; Supp. Aff. at 1-2. I find that the facts in *Rayborn* are comparable to Petitioner's case, but that Petitioner's pain was more severe and of longer duration.

Petitioner also cites to *Smallwood v. Sec'y of Health & Hum. Servs.*, No. 18-291V, 2020 WL 2954958 (Fed. Cl. Spec. Mstr. Apr. 29, 2020). In *Smallwood*, the special master awarded the petitioner $72,500 in pain and suffering damages where the injury was comparably severe to Petitioner's here. *Id.* at *17-18. I note, however, that the petitioner in *Smallwood* underwent only seven PT sessions and realized a near complete resolution of his shoulder pain in PT. *Id.* (noting that, after seven PT sessions, the petitioner "was experiencing no pain, and only pain at a level of 4 out of 10 after a full day's work."). Like Petitioner here, the petitioner in *Smallwood* also reported that his pain interfered with his ability to work at a job involving physical labor. *Id.* at *5. I find that the facts in *Smallwood* are comparable to Petitioner's case, but that the petitioner in *Smallwood* achieved better results from PT in fewer sessions.

## VI.     Conclusion

For the reasons discussed above, I find that $70,000 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.

Therefore, based on the record as a whole, I find the Petitioner is entitled to an award of:

A lump sum in the amount of **$70,000.00**, which represents an award of pain and suffering, in the form of a check payable to Petitioner.

This award represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a). In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court is directed to enter judgment herewith.[8]

**IT IS SO ORDERED.**

<u>s/ Katherine E. Oler</u>
Katherine E. Oler
Special Master

---

[8] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by jointly filing notice renouncing their right to seek review.